**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

| | | |
|---|---|---|
| ACR ACQUISITION, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| CITY OF PORT ST. LUCIE, FLORIDA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## COMPLAINT

Plaintiff, ACR ACQUISITION, LLC, files this Complaint against Defendant, CITY OF PORT ST. LUCIE, FLORIDA, and states as follows:

### Introduction

For years, the City of Port St. Lucie ("the City") has systematically discriminated against Plaintiff, ACR Acquisition, LLC ("ACR") and breached various agreements causing ACR significant reputational and monetary damages.

Since ACR annexed its property into the City nearly twenty-one years ago, it has paid the City over $42,500,000 to mitigate the impacts of a development that it has not been able to begin building, because of the calculated, unfair, and unlawful conduct of the City. Meanwhile, other similarly situated developers, whose property was annexed into the City at the same time and pursuant to the same Annexation Agreement, have nearly completed construction of their developments. This disparity in outcomes is both a direct result and stark evidence of the City's discriminatory treatment of ACR and its willful breach of its various contracts with ACR.

## Parties

1.      The City is a municipal corporation located in St. Lucie County, Florida. The City has land development and planning authority within its geographic boundaries.

2.      The City has adopted a comprehensive plan governing future land uses pursuant to Chapter 163, Florida Statutes. The City also adopted land development regulations to implement the comprehensive plan.

3.      ACR is a foreign limited liability company authorized to do business in the State of Florida.

4.      ACR owns property commonly referred to as Wilson Groves within the City's jurisdiction.  The Wilson Groves property is located within the City's Southwest Annexation Area.

## The Annexation Agreements

5.      ACR annexed its Wilson Groves property into the City's corporate jurisdiction pursuant to a multi-party Annexation Agreement, dated July 19, 2004, (the "Annexation Agreement"). The City encouraged the annexation because it significantly benefits the City's economic growth and development. St. Lucie Associates II, LLLP and St. Lucie Associates III, LLLP (collectively "GL"), Horizons Acquisition 2, LLC ("Kennedy Groves"), and Horizons Acquisition 5, LLC ("Southern Groves") (together with ACR, the "Annexation Developers"), annexed their respective properties into the City at the same time as parties to the same Annexation Agreement.

6.      The Annexation Agreement provided that these "Annexation Properties," totaling approximately 9,451 acres, "shall be annexed into the City together," on July 19, 2004.

7. Over time, the parties amended the Annexation Agreement six times to account for changes in the economy and changes in ownership of the properties.[1] As of the sixth and final amendment, GL and Kennedy Groves merged under the ownership of Riverland/Kennedy LLP, an entity controlled by GL.

8. The Southern Groves property straddles Interstate 95 and is the easternmost Annexation Property, with the Riverland/Kennedy property ("Riverland") located immediately adjacent to its western boundary. Riverland is also adjacent to Wilson Groves' northern and eastern boundaries. Wilson Groves is the westernmost Annexation Property bordering Range Line Road.

9. In the Annexation Agreement, the City acknowledged that development of the Annexation Properties will benefit the City's residents. Accordingly, the Annexation Agreement set forth individual Development Plans for each property and called for each of the Annexation Developers to make significant financial contributions to the City for the benefit of City residents.

10. The City required each Annexation Developer to pursue its Development Plan as a development of regional impact ("DRI") pursuant to section 380.06, Florida Statutes, and acknowledged that "certain portions of this Agreement will require the City and/or its boards, departments or agencies, acting in their governmental capacity, to consider certain changes in the City's Comprehensive Plan, zoning ordinances or other applicable City codes, plans or regulations, as well as to consider other governmental actions as set for this Agreement."

11. In several provisions of the Annexation Agreement including, without limitation, in section 4(b) of the original Annexation Agreement and section 11(b) of the Fourth Amendment

---

[1] Since the last amendment to the Annexation Agreement, Southern Groves was purchased by Mattamy Homes. The City also owns a portion of Southern Groves through the Port St. Lucie Governmental Finance Corporation.

to the Annexation Agreement, respectively, the City pledged to "give timely and fair consideration to all such development applications" and to conduct any proceedings related to such applications "openly, fully, freely and fairly in accordance with the law and both procedural and substantive due process to be accorded the applicant…."

12.     The Annexation Agreement required significant exactions from the Annexation Developers, including the dedication of school, park, and civic sites, and significant financial contributions to improve and construct the City's transportation network.  These dedications and financial contributions were exacted by the City for the ostensible purpose of mitigating the impacts of the development of each Annexation Property.

13.     Specifically regarding transportation, the Annexation Agreement required each Annexation Developer to convey right-of-way for and to construct Becker Road within its respective property.

14.     The Annexation Agreement also required Southern Groves to make significant dedications and financial contributions for the construction of the I-95 interchange at Becker Road and required GL and ACR to pay up to $12,500,000 each for the construction of a 4-lane section of Becker Road east of the I-95 interchange to the western terminus of the Florida Turnpike interchange.

15.     The City further required the Annexation Developers to dedicate right-of-way for and construct an interconnected internal roadway network among the Annexation Properties with a minimum of three north-south roads and three east-west roads, in addition to Becker Road and Village Parkway (the "Internal Road Network").

16.     ACR and GL were each required to contribute fifty (50) acres along their common

boundary "to allow the City the opportunity to create a 100-acre regional park…." ACR and GL were also required to dedicate additional neighborhood park acreage, which was to be conveyed to the City consistent with the approved DRI for each property.

17.    ACR and GL have parallel financial obligations under the Annexation Agreement, with each developer responsible for comparable contributions toward infrastructure improvements, roadway construction, and park dedication.

18.    The Annexation Agreement acknowledges that it constitutes a "vested rights determination" by the City that vests the Development Plans of each developer. This determination exempts each developer from the City's concurrency management system as to the uses, densities, and intensities contained in each developer's Development Plan "or any combination of uses which do not generate more transportation impacts than the uses described in each of the Development Plans."

### The DRI Approvals and Comprehensive Plan Amendments

19.    Each Annexation Developer applied for and received a development order from the City approving a Development of Regional Impact for its property (the "ACR DRI," "Southern Groves DRI," and "Riverland DRI," cumulatively, the "DRIs"). Each DRI contains a graphic depiction of the conceptual development plan for the property, referred to in each DRI as Map "H."

20.    Concurrent with its approval of the DRIs, the City amended its Comprehensive Plan to assign a New Community Development District ("NCD") future land use designation to each property. The NCD future land use designation replicates many of the requirements of the DRIs, including Map "H," into the City's Comprehensive Plan.

21.     The City has amended the DRIs several times over the years.

## The Becker Road Construction and Settlement Agreements

22.     As of late 2014, notwithstanding the plain language in the Annexation Agreement requiring GL to pay for the construction of a two-lane section of Becker Road through its property within sixty (60) days of the City owning such right-of-way (within one year of the date of the Annexation Agreement), GL had neither paid for nor constructed its portion of Becker Road nor had the City taken any action to enforce the terms of the Annexation Agreement against GL.

23.     On January 26, 2015, over ACR's objections, the City amended the Riverland DRI and the City's Comprehensive Plan.

24.     ACR was acutely harmed by GL's breach of the Annexation Agreement and the City's tacit approval of the breach because ACR owns the westernmost of the Annexation Properties and depended on the timely construction of the other Annexation Developer's portion of Becker Road to provide access to its Wilson Groves property. Without such access, development of Wilson Groves stalled even as the other properties were permitted to develop.

25.     On February 25, 2015, ACR filed a complaint challenging GL's amendment to the Riverland DRI as inconsistent with the City's Comprehensive Plan and seeking redress for the City and GL's breach of the Annexation Agreement.

26.     On March 8, 2021, while litigation was ongoing, the City Council acknowledged the merits of ACR's lawsuit and sought to enforce the Annexation Agreement against GL by sending notice to each of the Annexation Developers to fund construction of the road.

27.     As a result, the City held a public hearing on February 14, 2022, and executed a construction agreement with each of the Annexation Developers ("the Becker Road Agreements").

Under the Becker Road Agreements, each developer agreed to build Becker Road on and through their respective properties in accordance with a consistent design.

28.     At the February 14, 2022, hearing, Mayor Shannon Martin requested that each of the Becker Road Agreements be presented separately. Mayor Martin approved both the GL and Southern Groves Agreements. When ACR's Agreement was considered, she voted against the identical ACR Agreement stating that she did not have faith in ACR based on past events.

29.     Despite Mayor Martin's biased comments, ACR and the City entered into a settlement agreement on August 8, 2022 (the "Settlement Agreement").

30.     The Settlement Agreement, among other things, restated ACR's impact fee credits resulting from the Impact Fee Pre-Payment Agreement it had entered into with the City on February 26, 2007, and addressed future agreements the City "intends to enter into" with ACR relating to utilities, parks and drainage "similar to those that the City has entered into with other developers."

31.     In paragraph 5 of the Settlement Agreement, the City agreed "to not discriminate against ACR with respect to the timing and substance of such agreements."

32.     Pursuant to the ACR Becker Road Agreement, ACR was required to complete the construction of its section of Becker Road by February 14, 2025. Despite ACR's Becker Road section being four lane miles (double the length of the sections through the other properties), ACR completed and conveyed its portion of Becker Road ahead of schedule by November 2024.

### The City's February Workshop

33.     By 2021, since entering into the Annexation Agreement, ACR had conveyed lands for the required interconnected Internal Road Network, paid $12,500,000 towards improving

Becker Road east of I-95 (which lies outside ACR's property), paid over $5,600,000 to the City for economic development and job growth, and paid approximately $3,000,000 to the City in prepaid impact fees. Yet as of that date, ACR was unable to begin construction of its development because of the delay caused by the City's refusal to enforce the Annexation Agreement against GL.

34.     By contrast and at the same time, GL's Riverland had been approved to construct nearly half of the residential portion of its Development Plan, comprised mostly of active-adult, single-family residences ("Age-Restricted Units"). Similarly, Southern Groves was substantially completed. However, neither of these developers had completed construction of their portion of the Internal Road Network.

35.     On February 23, 2023, the City Council convened a workshop to discuss the Southwestern Annexation Port St. Lucie Road Network Study, which the City had commissioned to analyze the buildout of the Internal Road Network.

36.     The stated goal of the workshop was to ensure the complete build-out of the initial two lanes of the Internal Road Network by the Annexation Developers within the DRI properties. As presented by the City Engineer, Cole Schwedt, the City had contracted with Marlin Engineering to evaluate the current development patterns within the DRIs as well as the existing triggers in the various DRIs related to when certain roads were to be built. As noted by the City Engineer, the triggers in all of the DRIs attached to reaching the latter of a certain trip generation threshold or a certain number of single-family residential dwelling units.

37.     The City Engineer explained his concern that, because of the introduction of Age-Restricted Units within the Riverland DRI and the Southern Groves DRI, many of the thresholds

contained in those DRIs that trigger construction of the Internal Road Network may never be met - this means that those developers would not be required to construct the initial two lanes of the Internal Road Network within those properties prior to the completion of their developments.

38.     Among other things, the City Engineer requested that the City Council "give the City Manager authority to take every action necessary to try to eliminate trip generation from DRIs."

39.     In discussion, Vice Mayor Caraballo admitted that the City could not force the Annexation Developers to change their DRI triggers, as requested. City Attorney Jim Stokes reiterated that point, stating:

> That is why we made sure that language of your direction is to authorize the Manager to make every effort to get us where the Council wants us to be as a policy consideration, as long as we stay grounded in the fact that we cannot. … we cannot impose things that would violate any existing contracts or vested rights.

40.     As the discussion proceeded, Councilman Pickett asked what would happen if the Annexation Developers refused to voluntarily advance the construction of the Internal Road Network, to which City Manager Jesus Merejo answered, "I am sure we are going to be twisting their arms very tight, and it is going to hurt at the end."

41.     To date, the City has not eliminated trip generation from the triggers of either the Southern Groves DRI or the Riverland DRI. Nor has the City prevented either Southern Groves or GL from using a traffic calculation metric referred to as an ITE code (as set by the Institute of Transportation Engineers) which accounts for the reduced traffic generated by Age-Restricted Units, as compared to other types of single family development, in its traffic methodology. Further, the City has obtained no agreement by either Southern Groves or GL that either will complete its

portion of the Internal Road Network in the event the DRI thresholds are never met.

## **Map "H" Amendment Application**

42.     Prior to the February 23, 2022 Workshop, on May 27, 2021, ACR applied to amend Map "H" of its DRI and Figure 1-6 in the City's Comprehensive Plan, which replicates Map "H". The requested changes were nominal - ACR merely sought to relocate uses within its property. No change to the overall residential density or nonresidential intensity was requested.

43.     Both GL and Southern Groves (partially owned by the City's Government Finance Corp.) had sought and been approved for substantially similar changes to each's respective Map "H" and related Comprehensive Plan figure. Their applications were all processed rapidly by City staff and approved unanimously by the City Council in very brief public hearings with less than five minutes between staff presentation, applicant presentation, council deliberation and voting.

44.     Having seen the City's comfort level with GL and Southern Groves' substantially similar requests, ACR patterned its application and supporting material after their applications. For example, ACR prepared a traffic statement using the same methodology used by GL in support of its prior applications.  ACR's traffic statement demonstrated the change in location of the uses, which was consistent with the location changes made by the other developers, would not have any adverse impacts on City roads nor was any portion of its Internal Road Network triggered.

45.     Nevertheless, City Planning staff, at the direction of the City Manager and Assistant City Manager, initially refused to process ACR's application unless ACR agreed to amend its DRI development order. This was not required of either GL or Southern Groves.

46.     Throughout the year-long review process, City Planning staff, the City Manager and the Assistant City Manager demanded that ACR revise the methodology it used in its traffic

study significantly in ways they had not asked either Southern Groves or GL to do. In addition, consistent with the direction provided by the City Council at the February Workshop, City staff also demanded that ACR agree to conditions of approval that would require ACR to advance construction of its Internal Road Network though there was no nexus between that request and the impacts of ACR's applications.

47.     Ultimately, the City Planning staff recommended approval of ACR's applications with conditions in their memorandum to the Planning and Zoning Advisory Board ("PZAB"). Neither Southern Groves nor GL were subjected to similar recommended conditions as to their respective applications.

48.     The PZAB heard and unanimously recommended approval of ACR's applications at its public hearing on June 6, 2023.

49.     Just four days prior to the PZAB hearing regarding ACR's applications, John Shubin sent a letter to the City Attorney on behalf of GL, objecting to ACR's applications and urging the City to require ACR to advance construction of its Internal Road Network.

50.     At the time of the letter, GL had secured approvals to construct over 4,640 residential units and sought to block ACR's applications, despite ACR relying on the same traffic methodology that GL used to obtain its approvals.

51.     As noted above, notwithstanding the allegations in the Shubin letter, City Staff and the PZAB board both recommended approval of ACR's applications to the City Council, which was scheduled to hold its first of two public hearings on the applications on June 26, 2023.

52.     Based on nothing more than the letter from GL's lawyers, less than a week before the City Council public hearing, City Planning Staff revised its memorandum to recommend denial

of ACR's applications unless ACR would agree to construct its Internal Road Network well in advance of when it was legally required to do so pursuant to its vested Development Plan as set forth in its DRI.

53.     Shortly thereafter, the City Attorney informed ACR's representatives that the public hearing regarding its Comprehensive Plan amendment would be treated as a quasi-judicial hearing and that GL would be granted party intervenor status.  Case law well establishes that comprehensive plan amendment hearings are not quasi-judicial.

54.     During the June 26, 2023, hearing, the Mayor directed a number of derisive comments at ACR owners, Alex and Ramzi Akel, as well as their consulting team, and over the objection of ACR, GL was provided equal or more time to present their case in opposition to ACR's application than ACR, the actual applicant, was provided to present the application. Further, ACR was not permitted to address the misrepresentations of fact made by City staff and GL. Neither the hearing on Southern Groves nor GL's transmittal hearings proceeded in this way.

55.     Finally, directly after Councilwoman Stephanie Morgan moved to approve transmittal of ACR's proposed Comprehensive Plan amendment, which motion was seconded by Councilman Pickett, Mayor Martin requested a recess before the vote could be taken. When the Council returned from recess, Mayor Martin immediately sought to table the public hearing to a date certain two months hence, in August.

56.     When the public hearing was reconvened on August 7, 2023, the City Council voted to disapprove ACR's application.

57.     Subsequent to this hearing, on September 26, 2023, at a meeting with the City Manager and the representatives of Southern Groves, the City Manager advised Alex and Ramzi

Akel that if they wanted to be successful in the City, they should hire a front man to overcome the bad karma they had accumulated in the City. The City Manager further advised that neither Alex nor Ramzi should be actively involved in discussions with the City related to the development of the ACR property.

58.     In light of this advice, ACR was forced to incur the expense of engaging a third party to conduct negotiations on its behalf regarding its development and submitted a revised application for a revised amendment to Map "H" of its DRI and Figure 1-6 of the City's Comprehensive Plan. After almost a year of delay, the City ultimately approved these applications on March 11, 2024.

59.     Just prior to receiving this final approval, ACR applied to rezone its first parcel within Wilson Groves for development of an age-restricted residential community.

60.     Once again ACR submitted materials in keeping with the applications previously submitted by GL and Southern Groves for their MPUDs, including a traffic study analyzing the trips that would be generated by its Age-Restricted Units. Unlike GL and Southern Groves, ACR's study was required to include an alternate analysis to determine whether any of its internal roads would be triggered by a non-age-restricted single family home community. Under neither scenario were any internal roads triggered.

61.     At first reading, on March 25, 2024, City Staff recommended approval of and City Council approved, the MPUD rezoning Ordinance for Parcel A subject to the condition that ACR remove any reference to age-restricted uses from its traffic study prior to the City's final approval of the Ordinance.

62.     Understanding that it had no choice but to accept the unfair condition if it wanted

to make beneficial use of its property, ACR agreed under protest to the condition and the rezoning was approved by the City Council at second reading on April 8, 2024.

63.     Just over a month later, on June 10, 2024, the City approved GL's fifth Age-Restricted MPUD rezoning application for Parcel E authorizing construction of an additional 2,000 homes. As it has done consistently over the course of GL's build-out of Riverland, in stark contrast to its treatment of ACR, the City allowed GL to utilize the age-restricted traffic generation rate to analyze whether the proposed development would trigger construction of any roadways within the Riverland DRI, which it did not.

### Traffic Calculations for Age-Restricted Development

64.     ACR's Development Order authorizes it to develop "single-family homes."

65.     The City of Port Saint Lucie's zoning code contains a variety of residential zoning districts for single-family homes. None of the zoning districts limit the development of single-family homes that are "age-restricted," such as homes intended for 55+ year old residents. Similarly, nothing in ACR's Development Plan limits its ability to develop its single-family home communities as Age-Restricted Units.

66.     Age-restricted developments are widely understood to impose fewer impacts on certain public facilities, such as schools, parks, and roads, based on data regarding facility utilization by 55+ year old residents.

67.     In the context of traffic facilities, the City's zoning code actually *requires* application of trip assignment ratios set forth in the state approved and widely accepted traffic engineering manual referred to as the Institute of Transportation Engineers ("ITE") trip generation manual. Age-restricted residential uses have a lower trip generation rate in the ITE than a non-age-

restricted residential use.

68.     Both the City's Code and ACR's approved Development Order requires that a trip generation analysis shall be submitted prior to each site plan or residential subdivision plat approval using the trip generation rates included in the latest available ITE report.

69.     Separate from ACR's approved Development Order, the City's adopted mobility fee schedule also recognizes the reduced impact of age-restricted residential uses. The City applies a lower per-unit mobility fee rate to age-restricted single-family homes compared to non-age-restricted units, further confirming the City's acknowledgment regarding the lower level of impacts caused by age-restricted development—consistent with national traffic engineering standards.

70.     Both GL and ACR have decided to develop some or all of their respective developments as age-restricted. Yet, the City has allowed GL to apply the lower trip generation rate for age-restricted residential uses to its traffic generation calculations while denying the same right to ACR.  Specifically, as discussed above, the City has refused to process ACR's applications if the applications rely on the "age-restricted" ITE Code.

71.      In fact, the City has acknowledged in writing that it has applied two different standards with respect to the application of ITE trip rates for age-restricted developments to ACR and GL.

72.     As a result of the discriminatory treatment, GL has been able to develop over 4,000 homes to date with an additional 2,000 homes approved as age-restricted and to recognize the age-restricted nature of the impacts of those homes when calculating the timing and extent of traffic contributions, and the amount of required impact and mobility fees. The City's inconsistent

application of its own standards has resulted in discriminatory, unfair treatment of one developer over another under similar circumstances. While GL has been allowed to rely on the lower trip generation rate applicable to age-restricted housing, the City has not only denied ACR the same right, but has also sought to strong-arm ACR into paying greater exactions by accelerating its traffic-related obligations beyond what is required under its existing Development Order.

73.     Additionally, Southern Groves (partially owned by the City's Government Finance Corp.) has utilized age-restricted trips for its traffic studies and calculations. ACR is the only of the three Annexation Developers who are parties to the Annexation Agreement that is being prevented from using the age-restricted trip generation rate, even though the three developers are similarly situated in all material respects regarding same.

74.     Worse, certain City officials actively coordinated with GL representatives to accomplish this disparate treatment, to advantage GL's development at ACR's expense and to devalue ACR's property, in an attempt to force ACR to sell the property and provide GL a competitive advantage.

75.     During numerous public hearings, the Mayor falsely and inappropriately accused ACR of seeking approvals solely to sell the property—an allegation that is both irrelevant to the proceedings and factually unfounded.

76.     GL's representatives exchanged correspondence with City officials wherein GL's representative encouraged the City to treat ACR differently and to otherwise frustrate ACR's development efforts.  As such, the disparate treatment described in this Complaint was intentional and malicious.

77.     This disparate, disadvantageous treatment will cost ACR millions of dollars in lost

profits, additional traffic contributions, as well as increased costs in consultant and attorneys' fees for the planning and processing of traffic studies and planning applications that were not required by or consistent with the City's Comprehensive Plan or Zoning Code.

### Discriminatory Treatment –Failure to Enforce Consistent Becker Road Section

78.     As previously noted, under the Becker Road Agreements, each Annexation Developer was required to build a portion of Becker Road. The Annexation Developers and the City coordinated a typical cross-section for the road's construction so that each Developer's work would match. The cross-section addressed specifications including asphalt, utilities, and drainage. The same cross-section is included within each Annexation Developer's Becker Road Agreement.

79.     The intent of the parties in coordinating the cross section and including it in the Agreements was for Becker Road, despite being constructed by three different developers, to be developed as a cohesive continuous road section.  The coordination included not only consistent engineering specifications but also uniform landscape irrigation and sod, ensuring visual and functional continuity across all segments of the roadway.

80.     ACR constructed its portion of Becker Road consistent with the agreed-upon, typical cross-section and the City's landscape and irrigation plans.

81.     By contrast, the GL segment of Becker Road was constructed using Bahia seed instead of St. Augustine Floratam sod and without required irrigation facilities, in direct conflict with the City's standard requirement that St. Augustine Floratam be used in all newly constructed roadway segments. The GL Becker Road segment is the only recently constructed road within the City that does not comply with this requirement.

82.     As part of the Becker Road improvements, the City hired a third-party landscape

architect to prepare a unified landscape and irrigation plan (the "City Landscape Section") intended to ensure consistency across all segments constructed by the three Annexation Developers. Each Developer was required to submit a landscape and irrigation plans consistent with this cross section for their respective portion of Becker Road.

83.     Even though only ACR constructed its road segment in full compliance with the City Landscape Section, including both proper landscaping and irrigation, the City failed to enforce its own standards for the other Developers. GL failed to install required irrigation, and Southern Groves installed irrigation but failed to install landscaping consistent with the City Landscape Section. The City nonetheless approved both noncompliant segments, creating a fragmented and inconsistent appearance and undermining the original intent of visual and functional cohesion.

84.     However, in the fall of 2024, the City promptly accepted conveyance of the GL segment of Becker Road, despite its noncompliance with the City Landscape Section, including the absence of required irrigation and use of Bahia seed in place of St. Augustine Floratam.

85.     The City breached the Becker Road Agreements by accepting the road segments that failed to comport with the agreed-upon cross-section and City Landscape Section.

86.     The City is also on notice that developer Mattamy failed to install its landscaping according to the agreed-upon typical cross-section. Yet, the City has refused to require Mattamy to correct the landscaping deficiencies on its roadway segments.

87.     Accordingly, the City's discriminatory handling of ACR's road plans breached the City's obligation to fairly process applications for governmental action amongst the Developers.

### Discriminatory Treatment –*Paseo*

88.     ACR previously proposed to develop Paar Road as a *paseo*, a road design that

promotes multi-modal transportation and adds long-term value to the surrounding community. At that time, the City rejected ACR's request outright—effectively treating it as dead on arrival—without offering meaningful review or consideration. By contrast, GL had previously received approval for the use of *paseos* in other parts of the City, including along similar road segments.

89. Now, GL is seeking to install a *paseo* along the very same segment of Paar Road that ACR once proposed. Yet instead of summarily rejecting GL's request as it did with ACR, the City is engaging a third-party consultant to conduct a feasibility study—demonstrating a willingness to entertain and support GL's proposal that was categorically denied to ACR. This disparate and preferential treatment constitutes clear and unjustifiable discrimination, harms ACR's development potential, diminishes the value of its land, and results in lost economic opportunity.

### Excess Mobility Fee Demands

90. The City has publicly acknowledged that some of the roadway facilities being developed by ACR are intended to support future traffic volumes, including those generated by other developments—whether already annexed or anticipated for future annexation west of ACR's project area. However, ACR's Development Order clearly states that ACR is responsible only for mitigating the traffic impacts generated by its own development, and that such impacts—based on ACR's projected traffic volumes—must form the basis for determining required roadway improvements, not the projected traffic from unrelated future developments.

91. Under ACR's approved Development Order and associated traffic studies, ACR's traffic impact justifies at most the construction of four-lane sections on certain road segments. However, the City is requiring that ACR design its roadway cross-sections as ultimate six-lane sections, despite there being no immediate or project-related need for six lanes.

92.     This design requirement is inconsistent with how the City has treated similarly situated developers. For example, despite owning a 150' wide right-of-way (which could accommodate an ultimate six-lane section), exactly the same as the rights-of-way conveyed by ACR, the City approved Hegener Drive in Southern Grove as an ultimate two-lane section and the North/South A roadway in Western Grove as an ultimate four-lane section—both of which serve developing areas with significant projected growth. The City's insistence that ACR design for six lanes, while approving smaller ultimate sections elsewhere, bears no reasonable relationship to the impacts of ACR's development and constitutes arbitrary and inequitable treatment.

### Improper Application of Park Acreage Requirements

93.     Pursuant to the Settlement Agreement, ACR sent the City a draft park conveyance agreement with regards to the forty acres of neighborhood parks and 50-acre regional park donation, patterned after the park conveyance agreement approved by the City for GL, which provides for a number of small neighborhood parks and a large regional park.

94.     However, after months of silence on the matter, the City responded by providing ACR with a proposed draft park conveyance agreement that materially differed from the Riverland/City Agreement in ways that harmed and discriminated against ACR.

95.     Furthermore, City staff verbally demanded that ACR consolidate *all* of the land it will provide to meet both neighborhood and regional park requirements into a single parcel, instead of providing just the one 50-acre regional park site specified in the Fourth Amendment to the Annexation Agreement and meeting the remaining park donation requirements through the provision of neighborhood parks.

96.     Nothing in City's Comprehensive Plan, zoning code, ACR's Development Order,

or in the Annexation Agreement requires such consolidation. Further, under the ACR Development Order and the Annexation Agreement, there has always been a clear distinction between neighborhood parks which are to serve the immediate residents and the regional park which is to serve the broader community.

97.     Within the adjacent DRIs, other developers have been allowed to meet park acreage requirements through the provision of neighborhood parks in separate locations during the development of the neighborhood being served, under the same or substantially similar terms as requested by ACR.

98.     This disparate treatment places ACR at a disadvantage, because allowing a developer to meet the park donation requirements through neighborhood parks allows the developer to plan for parks to serve its intended customers and expands the layout opportunities available to the developer which maximizes the productive potential of its property. Similarly, the City's refusal to allow ACR to proceed with its park conveyance plan has restricted its marketing of planned developments and lowered the property's value to future home buyers. Accordingly, ACR has been financially harmed by the City's demand for a consolidated park site donation.

99.     In addition to demanding that the parks be provided in a consolidated location, the City has demanded that the regional park and a 50-acre civic site be conveyed within twelve months of the execution of a Parks and Civic Site Conveyance Agreement. This demand violates the ACR Development Order, which provided that the 50-acre regional park site be provided before the 6,001st building permit is issued, which has not yet occurred. By way of comparison, under its park agreement, GL was not required to convey its portion of the 50-acre regional park prior to the 6,001st building permit being issued.

100. Accordingly, both the substance and the timing of the park donation demands represent discrimination on the part of the City in violation of the Annexation Agreements, the Settlement Agreement, and the ACR Development Order, which specifically provide that the park conveyances would be handled in a manner that did not discriminate between the Annexation Developers.

<u>**Procedural Due Process Violations and Public Mistreatment**</u>

101. The City has specifically singled out ACR's owners and managers for discriminatory treatment. For example, the City Manager told ACR's representative that ACR's chances of approval would be improved if the Akels were not "the face" of ACR during the application process. ACR was forced to hire a consultant to present its applications before it was able to receive approvals to which it was clearly entitled because of this personal animus against them on the part of the City.

102. It is notable that the Mayor voted to approve the GL and Mattamy Becker Road Agreements but voted to deny ACR's Becker Road Agreement "as a matter of principle" because she claimed that ACR did not keep its promises, even though ACR has performed each and every requirement set forth in the Comprehensive Plan, the zoning code, and the Annexation Agreements–unlike other developers, including GL.

103. Moreover, the City's Mayor actually paused one of the City Council's public meetings at which it was considering one of GL's land development applications because ACR expressed a desire to offer public comment. The City's Mayor called for a recess, stepped off the dais, and personally scolded ACR and its representatives in a raised voice for their attendance at a public meeting. The City Mayor told ACR it was inappropriate for it to comment at the public

meeting and directed the City to find a way to prevent ACR from participating.

104.    By contrast, the City – and specifically the City's Mayor – has gone out of its way to create expanded opportunities for GL to be heard on ACR's development requests.  As noted above, when ACR first sought a Comprehensive Plan amendment to amend its Map "H" at the request of City staff, the City improperly and over ACR's objection treated its decision on the Comprehensive Plan amendment as a quasi-judicial decision, even though case law is uniform in identifying such decisions as legislative in nature.  If the hearing was correctly identified as legislative, GL would not have been allowed to participate beyond offering a three-minute public comment. By intentionally misapplying the review standard, the City engineered an opportunity for GL to be treated as a party to the City's hearing on ACR's application.

105.    During the hearing, the City accepted into evidence GL's false and misleading testimony regarding ACR's application, using it as a pretext to deprive ACR of the same amendment it earlier granted to GL.

106.    Throughout the many public hearings held on various applications filed on behalf of ACR and GL, the difference in treatment of the two developer's representatives was stark. GL's representative was treated courteously, while ACR's representatives were treated with open derision, particularly by the City Mayor and Vice Mayor.

107.    During some of these hearings, City officials engaged in undisclosed text message discussions with GL representatives (a former City attorney) intended to circumvent the quasi-judicial processes insisted on by the City itself.

108.     In glaring contrast to its treatment of ACR's applications, when ACR submitted formal objections to the same development applications filed by GL, the City treated those hearings

as legislative in nature—not quasi-judicial—thereby denying ACR the ability to present evidence, cross-examine witnesses, or participate as a party. This inconsistent application of procedural rules further illustrates the City's unfair, selective treatment and its willingness to adjust procedural frameworks to limit ACR's participation, while expanding GL's involvement.

109.    Thus, the City's behaviors have been uniformly discriminatory towards ACR throughout the public hearing process in both the Comprehensive Plan amendment and zoning application process – the very opposite of the free, open, and fair processing the City promised to provide ACR in the Annexation Agreements.

### Damages as a Result of Delay

110.    In the proceedings described herein, the City intentionally delayed ACR's applications – tabling hearings, requiring processes not required of the other Annexation Developers, and requiring additional application materials not required of other Annexation Developers.

111.    In addition to the increased consulting costs and lost development opportunities described herein, the delay occasioned by the City's discriminatory treatment has subjected ACR to increased fees.

112.    Last fall, the City dramatically increased its utility capacity reservation and connection charges.

113.    If ACR's Development Order applications were processed in a timely fashion, ACR would have vested its capacity and connection charges under the prior fee schedule.  Now, because of the City's purposeful delay in processing ACR's Development Order applications, ACR will have to pay hundreds of thousands of dollars in increased connection charges as its development

proceeds.

114.    As noted above, the City committed in the Annexation Agreements to timely, freely, fairly, and openly process ACR's Development Order. The City's scheme to delay ACR's approvals represents an intentional breach of this basic contractual obligation.

## Pattern of Bad Faith and Discriminatory Conduct

115.    The City's conduct toward ACR, as outlined in the preceding paragraphs, reflects not merely inconsistent application of planning standards but a sustained pattern of bad faith conduct. The City repeatedly deviated from its own regulations and policies, imposed requirements on ACR that were not imposed on similarly situated developers, and openly favored ACR's competitors—particularly GL. These actions were not inadvertent. They were part of a deliberate and coordinated strategy to frustrate ACR's development rights, increase its costs, attempt to force the sale of ACR's property, and depress the value of its property.

116.    This conduct included without limitation: (1) refusing to allow ACR to use the trip generation rates used by other developers; (2) denying ACR's *paseo* and park proposals while accepting identical proposals from GL; (3) failing to enforce uniform road and landscape standards on other developers while insisting ACR meet the standards; and (4) repeatedly and publicly undermining ACR representatives during public hearings. The City's conduct was undertaken in bad faith, without legitimate justification, and for the improper purpose of advancing private interests at ACR's expense.

117.    The City's actions, as detailed above, reflect a sustained pattern of arbitrary and discriminatory enforcement of its development policies. This pattern not only violates the terms of the City's contractual commitments to ACR, but also distorts the competitive landscape to the

benefit of favored developers, eroding public trust in the City's land use processes.

118.    In addition to the damages identified herein, the City's sustained practice of preferring other developers, including GL, gave GL an unfair competitive advantage in the market. GL has been able to build and sell 4,000 homes while ACR has not received approval to build its first home.

**COUNT ONE – SECTION 1983 CLAIM**
**Equal Protection (Nationality, Ethnicity, and Language)**

119.    Paragraphs 1 through 118, are re-alleged and re-incorporated as though fully set forth herein.

120.    This Count alleges a violation on the part of the City of Port St. Lucie of Plaintiff's right to equal protection under the law, pursuant to the Fourteenth Amendment to the Federal Constitution.

121.    This claim is brought under 42 U.S.C. Section 1983.

122.    Any presuit conditions have been satisfied or waived.

123.    Venue is appropriate in the Southern District Court of Florida, Fort Pierce Division, because both the City and the property that form the subject of the City's actions are located within St. Lucie County.

124.    ACR is owned and managed by persons of Lebanese descent, the Akels.

125.    ACR is owned and managed by at least one person, Ramzi Akel, who is originally from Israel and speaks with a heavy accent, English being his third language.

126.    ACR's principals and managers are regarded by the City, its Council members, and its staff, as having a foreign nationality, a foreign ethnicity, and speaking a foreign language.

127.    The Akels' national origin, ethnicity, and native language, place them in a suspect

classification. By contrast, the comparator Annexation Developers are not owned, managed, or represented by persons fitting within these suspect classifications.

128.    In the consideration of their Map "H" Amendments, ACR, and GL, Kennedy Groves, and Southern Groves "the Annexation Developers," are similarly situated in all material respects.

129.    Similarly, ACR and GL Homes are comparators similarly situated in all material respects regarding their requests for *paseos*.

130.    Further, ACR, GL, and Southern Groves, are comparators similarly situated in all material respects with respect to application of the agreed-upon landscaping sections.

131.    Likewise, ACR and the other Annexation Developers are comparators similarly situated in all material respects with respect to the park acreage contribution requirements.

132.    Nevertheless, the City, including without limitation its Mayor and Vice Mayor, and its staff, has chosen under color of State law and pursuant to City policy, practice, and custom, to treat ACR disadvantageously and unequally than the other Annexation Developers, who are similarly situated to ACR in every material respect.

133.    The disadvantageous, unequal, and discriminatory treatment includes the City's handling of ACR's land development decisions regarding ACR's landscaping, park, and transportation facility obligations, ACR's Map "H" amendment, refusing to allow ACR to use age-restricted traffic calculation methodology codes, requiring additional landscaping requirements of ACR but not of its comparators in the build-out of Becker Road, refusing to consider ACR's requests for *paseos* but not refusing the same requests by its comparators, requiring additional park donation requirements that were not required of ACR's comparators, and purposely engineering

delay as to the issuance of ACR's land development approvals.

134.    The City's disparate treatment of ACR in the application of its planning and zoning authority is motivated by its intent to discriminate against ACR, based on the actual and perceived foreign nationality of ACR's principals and managers, based on the actual and perceived ethnicity of ACR's principals and managers, and based on Ramzi Akel's primary language.

135.    The City's treatment of ACR as detailed in this Complaint is arbitrary and capricious.

136.    ACR has suffered monetary damages because of the City's unequal, disadvantageous, and discriminatory treatment in the form of increased development costs, increased consultant fees and attorney's fees, increased contributions of money and land over that which is required by the City's code and comprehensive plan, diminution in property value, and lost profits.

137.    ACR has retained the undersigned attorneys to bring this action and committed to pay reasonable attorney's fees for the prosecution of this action.

WHEREFORE, ACR Acquisition LLC, demands monetary damages, attorney's fees and costs, and judgment in its favor and against the City of Port St. Lucie, and such other relief as the Court deems appropriate.

## COUNT II – SECTION 1983 CLAIM
### Equal Protection (Class of One)

138.    Paragraphs 1 through 118, are re-alleged and re-incorporated as though fully set forth herein.

139.    This Count alleges a violation on the part of the City of Port St. Lucie of ACR's right to equal protection under the law, pursuant to the Fourteenth Amendment to the Federal

Constitution.

140.    This claim is brought under 42 U.S.C. Section 1983.

141.    Any presuit conditions have been satisfied or waived.

142.    Venue is appropriate in the Southern District Court of Florida, Fort Pierce Division, because both the City and the property that form the subject of the City's actions are located within St. Lucie County.

143.    In the consideration of their Map "H" Amendments, ACR, and GL, Kennedy, and Southern Groves "the Annexation Developers," are similarly situated in all material respects.

144.    Similarly, ACR and GL are comparators regarding their requests for *paseos*, similarly situated in all material respects.

145.    Further, ACR, GL, and Southern Groves, are comparators similarly situated in all material respects with respect to application of the agreed-upon landscaping sections.

146.    Likewise, ACR and the other Annexation Developers are comparators similarly situated in all material respects with respect to the park acreage contribution requirements.

147.    Nevertheless, the City, its Mayor and Vice Mayor and its staff, has chosen under color of State law and pursuant to City policy, practice, and custom,  to treat ACR disadvantageously and unequally than the other, similarly situated Annexation Developers in the City's handling of ACR's land development decisions regarding ACR's landscaping, park, and transportation facility obligations, including without limitation ACR's Map "H" amendment, the landscaping requirements, the requests for *paseos*, the park acreage contributions, and the engineered delay in approving ACR's development applications.

148.    The City's disparate treatment of ACR and the Annexation Developers is motivated

by its discriminatory animus and is otherwise arbitrary and capricious.

149. The City's disparate treatment of ACR and the Annexation Developers has singled ACR out as a class of one, based on the City's hostility towards ACR including, without limitation, the hostility of the City's Mayor and Vice Mayor towards ACR and its principals. The City's actions are arbitrary and capricious and not justified by state law or the City's own comprehensive plan and zoning policies. The City has no legitimate state purpose in singling out ACR for the treatment described herein.

150. The City's unequal, disadvantageous, and discriminatory treatment of ACR has caused it financial harm in the form of increased development costs, increased consultant fees and attorney's fees, increased contributions of money and land over that which is required by the City's code and comprehensive plan, increased fees, diminution in property value, and lost profits.

151. ACR has retained the undersigned attorneys to bring this action and committed to pay reasonable attorney's fees.

WHEREFORE, ACR Acquisition LLC, demands monetary damages, attorney's fees and costs, and judgment in its favor and against the City of Port St. Lucie, and such other relief as the Court deems appropriate.

## COUNT III - ILLEGAL EXACTIONS
### Road Laneage

152. Paragraphs 1 through 32, and paragraphs 90 through 92, are re-alleged and re-incorporated as though fully set forth herein.

153. This Count alleges the City of Port St. Lucie has imposed on Plaintiff an illegal government exaction in violation of the Fifth Amendment to the Federal Constitution.

154. This claim is brought under 42 U.S.C. Section 1983.

155.     Any presuit conditions have been satisfied or waived.

156.     Venue is appropriate in the Southern District Court of Florida, Fort Pierce Division, because both the City and the property that form the subject of the City's actions are located within St. Lucie County.

157.     The City has demanded that ACR be financially responsible for and construct infrastructure for an ultimate 6-lane road at the time it constructs its 2-lane section, where its traffic only justifies a demand for a 4-lane road in contrast to its treatment of other developers for the same and similar roads.

158.     The City's demand for a 6-lane road lacks a reasonable nexus to and is not roughly proportional to the impacts of ACR's proposed development.

159.     ACR will be forced to spend hundreds of thousands of dollars in traffic contributions as a result of the City's illegal exactions for excess laneage.

160.     ACR has retained the undersigned counsel and agreed to pay reasonable attorney's fees for the representation.

WHEREFORE, ACR Acquisition LLC, demands monetary damages, attorney's fees and costs, and judgment in its favor and against the City of Port St. Lucie, and such other relief as the Court deems appropriate.

### COUNT IV - ILLEGAL EXACTIONS
### Trip Generation

1.     Paragraphs 1 through 77, are re-alleged and re-incorporated as though fully set forth herein.

2.     This Count alleges the City of Port St. Lucie has imposed on Plaintiff an illegal government exaction in violation of the Fifth Amendment to the Federal Constitution.

3.      This claim is brought under 42 U.S.C. Section 1983.

4.      Any presuit conditions have been satisfied or waived.

5.      Venue is appropriate in the Southern District Court of Florida, Fort Pierce Division, because both the City and the property that form the subject of the City's actions are located within St. Lucie County.

6.      The City has refused repeatedly and in writing to allow ACR to calculate its traffic facility contributions based on traffic counts that fairly and accurately account for the traffic impacts reasonably anticipated as a result of its age-restrict development.

7.      The City's demand that ACR calculate its traffic facility contributions based on traffic counts that do not account for the age-restricted nature of ACR's development does not further a legitimate state interest, lacks a reasonable nexus to, and is not roughly proportional to, the impacts of ACR's proposed development.

8.      ACR has and will continue to suffer hundreds of thousands of dollars in excess and accelerated traffic contributions as a result of the City's refusal to recognize the limited impact of ACR's age-restricted development on the City's roadway network, as well as other financial damages including, without limitation, lost profits, increased consultant and attorney's fees, and diminution in property value, as a result of the City's refusal to allow ACR to use the appropriate traffic calculation methodology for its proposed development.

9.      ACR has retained the undersigned counsel and agreed to pay reasonable attorney's fees for the representation.

WHEREFORE, ACR Acquisition LLC, demands monetary damages, attorney's fees and costs, and judgment in its favor and against the City of Port St. Lucie, and such other relief as the

Court deems appropriate.

## COUNT V - ILLEGAL EXACTIONS
### Parks Donation

10.     Paragraphs 1 through 32, and paragraphs 93-100, are re-alleged and re-incorporated as though fully set forth herein.

11.     This Count alleges the City of Port St. Lucie has imposed on Plaintiff an illegal government exaction in violation of the Fifth Amendment to the Federal Constitution.

12.     This claim is brought under 42 U.S.C. Section 1983.

13.     Any presuit conditions have been satisfied or waived.

14.     Venue is appropriate in the Southern District Court of Florida, Fort Pierce Division, because both the City and the property that form the subject of the City's actions are located within St. Lucie County.

15.     The City has demanded that ACR donate a consolidated 90-acre park site, instead of the 50-acre regional park site and remaining 40-acres of neighborhood park property required by the parties' Annexation Agreement.  The cost of donating a single, consolidated property, will be more expensive for ACR to accommodate than the donation of a smaller regional park site and separate, smaller donations for neighborhood parks. Further, ACR's ability to sell its homes in its community will be impaired by the lack of sufficient neighborhood-serving parks.

16.     The City's demand for a single consolidated park site lacks a reasonable nexus to and is not roughly proportional to the impacts of ACR's proposed development.

17.     The City's demand constitutes a violation of the prohibition against illegal governmental exactions, under Fifth Amendment of the Federal Constitution.

18.     ACR has retained the undersigned counsel and agreed to pay reasonable attorney's

fees for the representation.

WHEREFORE, ACR Acquisition LLC, demands monetary damages, attorney's fees and costs, and judgment in its favor and against the City of Port St. Lucie, and such other relief as the Court deems appropriate.

Plaintiff hereby demands jury trial on all actions so triable.

Respectfully submitted this 20th day of June, 2025.

Respectfully submitted,

LEWIS, LONGMAN & WALKER, P.A.

*/s/ Amy Taylor Petrick*
AMY TAYLOR PETRICK
Florida Bar No. 315590
Primary Email: apetrick@llw-law.com
Secondary Email: bpennington@llw-law.com
TARA W. DUHY
Florida Bar No. 0796891
Primary Email: tduhy@llw-law.com
Secondary Email: lburnaford@llw-law.com
360 South Rosemary Avenue, Suite 1100
West Palm Beach, Florida 33401
Telephone (561) 640-0820
*Counsel for Plaintiff*